1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GEMMA RISER,

                          Plaintiff,

        v.

CENTRAL PORTFOLIO CONTROL INC.
et al.,

                          Defendants.

CASE NO. 3:21-cv-05238-LK

ORDER GRANTING DEFENDANT
CENTRAL PORTFOLIO
CONTROL'S MOTION FOR
SUMMARY JUDGMENT AND
DENYING PLAINTIFF GEMMA
RISER'S MOTION FOR
SUMMARY JUDGMENT

        This matter comes before the Court on the parties' cross-motions for summary judgment. Because Plaintiff Gemma Riser has not supported her assertion that the underlying debt was invalid, the Court grants defendant Central Portfolio Control's motion for summary judgment, Dkt. No. 60, and denies Riser's motion for summary judgment, Dkt. No. 59.

## I.        BACKGROUND

        This matter arises from a $2,790.37 bill for medical care incurred when Riser gave birth to her daughter at St. Joseph Medical Center in the fall of 2015. Dkt. No. 1-2 at 9, 11.[1]

---

[1] The Court avoids including the full date of birth in light of Local Civil Rule 5.2(a)(1).

ORDER GRANTING DEFENDANT CENTRAL PORTFOLIO CONTROL'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF GEMMA RISER'S MOTION FOR SUMMARY JUDGMENT - 1

St. Joseph's attempts to bill insurance in late 2015 and early 2016 failed. *See* Dkt. No. 62-7 at 1. Riser blames this on St. Joseph "fail[ing] to place the correct date of birth on the claim." Dkt. No. 65 at 4. Central Portfolio Control ("CPC") counters that "the reason actually listed in the hospital records for the denial by Medicaid was 'missing/incomplete/invalid date of birth,'" thus, "it is not at all evident that the date was even listed in the first place" and "[i]t is also possible that the bill was rejected for other reasons not listed." Dkt. No. 67 at 2. From August 2016 to February 2017, St. Joseph attempted to contact Riser on multiple occasions, but its letters—including a "credit bureau warning"—were returned as undeliverable. Dkt. No. 62 at 5; Dkt. No. 62-7 at 1.

St. Joseph ultimately sent Riser's accounts to collections. It first sent the accounts to Link Revenue Resources, LLC ("Link"), a company that provides "the forwarding of medical accounts to third-party debt collectors." Dkt. No. 62 at 1. Link forwarded 12 of Riser's accounts to CPC for collection between May 10, 2017 and April 29, 2020. *Id.* at 2. During that time, Link intermittently recalled the accounts from, and re-placed the accounts with, CPC. *Id.* When the accounts were placed with CPC, "Medicaid Washington" was in the insurance field. Dkt. No. 63 at 3. According to Link, "[b]ecause the files were placed with CPC indicating a balance due and owing, it is CPC's understanding that any listed insurance has refused, rejected or failed to pay the account." *Id.* CPC began credit reporting Riser's accounts to Trans Union and Equifax (the "CRAs") in February 2019. *Id.* Riser never disputed the account with CPC or communicated with it in any way, nor was CPC informed of Riser's disputes by any other source, including the CRAs. *Id.*; Dkt. No. 61-2 at 4.

In December 2020, Riser filed a charity care application with St. Joseph. Dkt. No. 61-2 at 3. On December 22, 2020, St. Joseph denied the request because it required applicants to "exhaust[] other available source(s) of payment for . . . care," and it believed that Riser could have "other payment source(s) for which [it] ha[d] previously requested [her] cooperation[.]" Dkt. No.

62-3 at 1. According to St. Joseph's notes, Riser's application had no supporting documents. Dkt. No. 62 at 5; Dkt. No. 62-7 at 1. In early January 2021, after Riser corresponded with St. Joseph regarding the required information and submitted a completed application, St. Joseph approved her charity care application and wrote off the full amount of the debt. Dkt. No. 62 at 5; Dkt. No. 62-4 at 1; Dkt. No. 62-5 at 1–2. By January 6, 2021, Link recalled the accounts from CPC, and by January 18, 2021, CPC requested that the CRAs delete their reporting on the accounts. Dkt. No. 62 at 2, 5; Dkt. No. 63 at 3.

## II.   LEGAL STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

When parties file simultaneous cross-motions for summary judgment on the same claim, the Court "must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001); *see also Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (the district court "rule[s] on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." (cleaned up)). The Court "giv[es] the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). However, to the extent the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense

1  that, where the facts specifically averred by that party contradict facts specifically averred by the

2  movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

3      To establish that a fact cannot be genuinely disputed, the movant can either cite the record

4  or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an

5  adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

6  Once the movant has made such a showing, "the nonmoving party must come forward with specific

7  facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

8  *Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis, internal quotation marks, and citation omitted).

9  Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific allegations, *Lujan*,

10  497 U.S. at 888–89. Nor is it the Court's job to "scour the record in search of a genuine issue of

11  triable fact"; rather, the nonmoving party must "identify with reasonable particularity the evidence

12  that precludes summary judgment." *Kennan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (cleaned

13  up). The Court will enter summary judgment "against a party who fails to make a showing

14  sufficient to establish the existence of an element essential to that party's case, and on which that

15  party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   DISCUSSION

17      Riser moves for summary judgment on her claims that CPC violated sections 1692e and

18  1692f(1) of the Fair Debt Collection Practices Act ("FDCPA") by reporting a debt that she did not

19  owe to the CRAs, thus misrepresenting the "character, amount, or legal status" of the debt and

20  attempting to collect a debt that was not expressly authorized by an agreement or permitted by

21  law. Dkt. No. 59 at 1–2; *see* Dkt. No. 1-2 at 15–17 (alleging that CPC violated 15 U.S.C.

22  § 1692e(2), (8), and (10), and 15 U.S.C. § 1692f and 1692f(1)).[2]

23  ─────────────────

24  [2] The relevant sections of 15 U.S.C. § 1692e provide as follows:

   A debt collector may not use any false, deceptive, or misleading representation or means in
   connection with the collection of any debt. Without limiting the general application of the foregoing,

ORDER GRANTING DEFENDANT CENTRAL PORTFOLIO CONTROL'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF GEMMA RISER'S MOTION FOR SUMMARY JUDGMENT - 4

CPC moves for summary judgment on all of Riser's claims against it, including her claims under 15 U.S.C. §§ 1692d, 1692e, and 1692f, her state law claims under the Consumer Protection Act ("CPA") and the Collection Agency Act ("CAA"), and her state common law claim for the tort of outrage. Dkt. No. 60 at 1, 7–9; *see* Dkt. No. 1-2 at 15–19, 21–24.[3] Because Riser's state law claims are predicated on her FDCPA claims, the Court begins with the FDCPA.

The FDCPA is a "broad remedial statute" designed to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." *Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1060 (9th Cir. 2011) (quoting 15 U.S.C. § 1692(e)). The statute "comprehensively regulates the conduct of debt collectors, imposing affirmative obligations and broadly prohibiting abusive practices." *Id.* at 1060–61. Because the FDCPA is a strict liability statute, even an unintentional act can count as a violation. *Clark v. Cap. Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1175–76 (9th Cir. 2006) (unintentional misrepresentation violates section 1692e). To determine if a violation of the FDCPA occurred, the debt collector's actions are evaluated under

---

the following conduct is a violation of this section: . . .

    (2) The false representation of—

        (A) the character, amount, or legal status of any debt; or

        (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt . . . .

    (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed . . . .

    (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

Section 1692f of the FDCPA prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt," and Section 1692f(1) specifically prohibits the "collection of any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f, 1692f(1).

[3] Riser's Fair Credit Reporting Act claim against CPC was dismissed by stipulation of the parties. Dkt. No. 55; *see* Dkt. No. 1-2 at 19–21; Dkt. No. 60 at 8.

the "least sophisticated debtor" standard. *Stimpson v. Midland Credit Mgmt., Inc.*, 944 F.3d 1190, 1196 (9th Cir. 2019). The standard is objective, and asks whether "the least sophisticated debtor would likely be misled" by the debt collector's conduct. *Swanson v. S. Or. Credit Serv., Inc.*, 869 F.2d 1222, 1225 (9th Cir. 1988).

CPC argues that Riser's accounts were valid debts because Medicare had rejected the claims, making Riser the responsible party: "[u]ntil the debt was forgiven [in January 2021], it was a valid debt Plaintiff owed" and CPC was entitled to attempt to collect it. Dkt. No. 60 at 10. CPC further argues that, even if the debt was invalid, it had the right to reasonably rely on information provided to it by its client (in this case, Link acting on behalf of St. Joseph), and did not have a duty to independently investigate the claims. *Id.* at 10–11. Finally, CPC asserts that Riser cannot establish a prima facie case for any of her state law claims, and even if she could, the claims are preempted by the Fair Credit Reporting Act, 15 U.S.C. § 1681t(b)(1)(F). *Id.* at 17–22.

The problem for Riser—as CPC correctly argues—is that "there is nothing to support the claim that the debt was invalid and not collectible." *Id.* at 10. Because the materials and sources upon which Riser relies do not support her argument that she did not owe the debt when CPC engaged in collection efforts and credit reporting, and because each of Riser's claims are premised on her unsupported assertion that she did not owe the debt at those times, CPC is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(B); *Matsushita*, 475 U.S. at 587; *see also Chinnick v. Nat'l Credit Sys. Inc.*, No. C15-1675-BJR, 2017 WL 448377, at *3 (W.D. Wash. Feb. 2, 2017) (granting summary judgment to defendant where plaintiff failed to provide defendant or the court with proof that she did not owe the debt defendant was attempting to collect).

A.    **Riser's Medicaid Status is Not Dispositive**

Riser contends that "Medicaid refused to pay the bill because [St. Joseph] cited the wrong date of birth, despite the child being born at [St. Joseph]." Dkt. No. 59 at 3; *see also* Dkt. No. 65

at 4. However, she fails to support this assertion. No evidence in the record suggests that it was St. Joseph's fault that Riser's claim was denied.

In support of her argument that St. Joseph is to blame for her claim denial, Riser submits a summary of six of her St. Joseph accounts in collections and documents from December 2020 describing her Medicaid eligibility dates. *See* Dkt. No. 59 at 3–4; Dkt. No. 59-3. However, the December 2020 certificates of Medicaid eligibility, Dkt. No. 59-3 at 4–5, only show the dates of Riser's eligibility once she submitted complete information in 2020, and do not show that she took the necessary steps to submit the necessary coverage information to St. Joseph before then.[4] Indeed, the collection account summaries for her St. Joseph visits on October 31, 2015, November 2, 2015, and December 30, 2015 list Premera as the insurer. *Id.* at 2–3. Riser submits only a portion of the centrally important October 23–24, 2015 visit summary, cutting off the part identifying the insurer. *Id.* at 3. Adding to the confusion, her March 18, 2016 summary lists Medicaid as the insurer but also reflects a December 2020 write-off—making it unclear whether Medicaid was identified as the insurer in 2016 or in 2020. *Id.* at 6. Either way, however, the March 18, 2016 summary does not establish that Riser submitted adequate Medicaid coverage information at the time of her daughter's birth in October 2015. The last collection account summary is from July 14, 2016, and at that time the patient is listed as uninsured. *Id.* at 2.

The evidence submitted by CPC in support of its motion for summary judgment paints a fuller picture of the potential reasons that St. Joseph could not verify insurance coverage. St. Joseph's billing notes indicate that it attempted to bill Premera Blue Cross of Washington on October 24, 2015, but the claim was denied because the patient's date of birth "d[id] not match."

---

[4] The eligibility summary prepared by the Washington Health Benefit Exchange in December 2020 states that Riser was eligible for Medicaid coverage between April 1, 2015 and March 31, 2021, and that her daughter was eligible for Medicaid coverage between December 1, 2016 and November 30, 2021. Dkt. No. 59-3 at 5; *see also id.* at 4 (certificate of Medicaid coverage).

Dkt. No. 62-7 at 1. In addition, St. Joseph was "unable to validate coverage for the baby on the portal" for Premera, and "the guarantor was to have called in to Premera and rectify that situation[.]" *Id.* (capitalization altered).[5] The notes from October 25, 2015 state, "insurance verification complete for Medicaid was Provider One, subscriber coverage is active," but on November 9, 2015, Medicaid denied the claim because of a "missing/incomplete/invalid patient birth date." *Id.* (capitalization altered). An explanation of benefits from the Washington State Department of Social and Health Services corroborates this: it lists five different procedures from October 23, 2015 that Medicaid denied because the claim "lack[ed] information which is needed for adjudication"—specifically, a "[m]issing/incomplete/invalid patient birth date." Dkt. No. 62-2 at 1. On February 9, 2016, St. Joseph resubmitted the claim, and this time Medicaid denied it due to the existence of another possible payor: Premera. Dkt. No. 62 at 4–5; Dkt. No. 62-7 at 1 ("[Riser] had coverage under Blue Cross Premera until 03/03/16 and baby was never added, Medicaid denied due to other possible payor" (capitalization altered)). On April 6, 2016, St. Joseph's notes indicate that it was "unable to verify patient in Provider One webportal – guarantor will need to call and provide the correct insurance information for billing." Dkt. No. 62-7 at 1 (capitalization altered). The notes add that Riser's responsibility is the full amount of the claim: $2,790.37. *Id.*

Riser argues that "[i]t is black-letter law that Medicaid patients cannot be directly billed for Medicaid services, even if Medicaid fails to pay." Dkt. No. 59 at 10 (emphasis omitted). But even assuming that she was a Medicaid patient on October 23 and 24, 2015, she has failed to establish that there are no circumstances in which a provider may lawfully seek payment on Medicaid claims from a Medicaid client. Medicaid is the "payer of last resort," and providers are

---

[5] St. Joseph's Financial Assistance Policy defines "guarantor" as "an individual who is legally responsible for payment of the patient's bill." Dkt. No. 59-4 at 5. Here, "guarantor" refers to Riser. *See* Dkt. No. 62-7 at 1 (using the term in a manner indicating that Riser is guarantor, e.g., "F[inancial] A[ssistance] denied due to Guarantor not responding regarding her insurance carrier to correct patient[']s date of birth" (capitalization altered)).

required to seek payment from third parties such as private insurance when those third parties may cover the same services. *See* Wash. Admin. Code § 182-502-0100(2) (listing exceptions not applicable here); *id.* § 182-501-0200(6) ("The agency does not pay for medical services if third-party benefits are available to pay for the client's medical services when the provider bills the agency[.]"); 42 U.S.C. § 1396a(a)(25)(A) (requiring state Medicaid agencies to "take all reasonable measures to ascertain the legal liability of third parties . . . to pay for care and services available" under the state Medicaid plan). In addition, Washington law permits a provider such as St. Joseph to bill a client where the client "[r]efuse[s] to complete and sign insurance forms, billing documents, or other forms necessary for the provider to bill the third party insurance carrier for the service." Wash. Admin. Code § 182-502-0160(6)(a)(ii); *see also id.* § 182-501-0200(7) (a client is liable for medical service charges when the client either receives direct third-party reimbursement or fails to execute legal signatures on insurance forms, billing documents, or other forms necessary to receive insurance payments). Guidance from the Washington State Health Care Authority confirms that where a provider "cannot locate any benefit information," it may "bill the client but must refund and bill ProviderOne if the client receives coverage." Washington State Health Care Authority, *Billing a Medicaid Client: Frequently Asked Questions (FAQs)*, https://www.hca.wa.gov/assets/billers-and-providers/webinar_billingaclientfaq.pdf (last visited June 26, 2023).

As discussed above, undisputed evidence proffered by both Riser and CPC suggests that St. Joseph had reason to believe that Riser had third party insurance from at least October 2015 to March 2016. Riser's collection account summaries list Premera as the insurer on October 31, 2015, November 2, 2015, and December 30, 2015. Dkt. No. 59-3 at 2–3. And St. Joseph's notes state that Riser "had coverage under Blue Cross Premera until 03/03/16 and baby was never added," that "Medicaid denied due to other possible payor," and that "the facility was unable to validate

coverage for the baby on the portal and that [Riser] was to have called in to Premera and rectify that situation." Dkt. No. 62-7 at 1 (capitalization altered). Aside from Riser's potential third party insurance, there was a problem with a missing, incomplete, or incorrect date of birth. Although Riser asserts that St. Joseph input the wrong date of birth for the baby, the evidence indicates only that the "patient's" date of birth was "missing/incomplete/invalid." Dkt. No. 62-7 at 1; Dkt. No. 62-2 at 1. Moreover, none of the evidence indicates that St. Joseph committed any error; instead, it appears that Riser was responsible for providing or correcting certain information, and that St. Joseph and CPC attempted to contact her without success. *See, e.g.*, Dkt. No. 62 at 5; Dkt. No. 62-7 at 1–2; Dkt. No. 65-2 at 4–6. By April 6, 2016, St. Joseph's notes conclude that Riser would "need to call and provide the correct insurance information for billing." Dkt. No. 62-7 at 1 (capitalization altered). From there, the same issues appear to persist until the end of 2020: St. Joseph's notes from December 22, 2020 state that "f[inancial] a[ssistance was] denied due to guarantor not responding regarding her insurance carrier to correct patient[']s date of birth." *Id.*; *see also* Dkt. No. 62-3 at 1 (stating that Riser's financial assistance application was denied because Riser must "exhaust[] other available source(s) of payment for . . . care, and [St. Joseph] believe[s] that there could be other payment source(s) for which [it] ha[d] previously requested [her] cooperation[.]"). The existence of a potential third party insurer and lack of necessary information for St. Joseph to bill Riser's insurer(s) indicate that St. Joseph had grounds to bill Riser under Section 182-502-0160(6)(a)(ii) of the Washington Administrative Code. In any case, none of this evidence indicates that Riser did not owe the accounts, leaving no material fact in dispute.

Riser also argues that because hospital care and maternity care are covered services under Medicaid, St. Joseph was prohibited from billing her directly for the services. Dkt. No. 59 at 3; Dkt. No. 65 at 3–4. In support of this contention, Riser cites 42 C.F.R. § 447.15, which requires providers who participate in Medicaid to "accept, as payment in full, the amounts paid by the

agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual." Riser also cites Section 182-502-0160(4) of the Washington Administrative Code, which states that a "provider must not bill a client . . . for . . . [a]ny services for which the provider failed to satisfy the conditions of payment described in the agency's rules, the agency's fee-for-service billing instructions, and the requirements for billing the agency-contracted MCO [managed care organization] in which the client is enrolled."[6] Subsection (b) specifies that a provider must not bill a client for a "covered service even if the provider has not received payment from the agency or the client's MCO." Wash. Admin. Code § 182-502-0160(4)(b). Subject to certain exceptions, a provider may not bill a client without executing form 13-879, Agreement to Pay for Healthcare Services, which permits a client to be billed only for services that are not covered or not deemed medically necessary. *See id.* § 182-502-0160(5).[7] An exception of relevance here is Section 182-502-0160(6), which—as noted above—allows providers to bill clients without executing form 13-879 where the client "[r]efuse[s] to complete and sign insurance forms, billing documents, or other forms necessary for the provider to bill the third party insurance carrier for the service." The evidence submitted by both Riser and CPC shows that St. Joseph did not have complete or accurate information to bill Riser's insurer(s), and Riser has not established a genuine dispute of fact that this was St. Joseph's fault.

For these reasons, it cannot simply be inferred from the fact that Riser was a Medicaid patient that St. Joseph could not legally charge her after Medicaid denied the claim.

---

[6] Riser additionally cites Section 182-502-0160(4)(c) of the Washington Administrative Code, Dkt. No. 59 at 3, but that section appears to be irrelevant because it deals only with denial of authorization requests, and none of the evidence put forward by the parties suggests that an authorization request was at issue in Medicaid's denial of this claim.

[7] Riser also notes that, under Washington law, if a mother has coverage for maternity services under her health plan, her infant is automatically covered under the same plan for the first 21 days of their life. Dkt. No. 59 at 3 (citing Wash. Rev. Code § 48.43.115(3)(f)).

**B.     Riser's Other Arguments Fail to Establish a Genuine Dispute Over Whether She Owed the Bill**

Riser advances various other arguments for why she did not owe the bill, but none of them succeeds.

First, Riser argues that the eventual acceptance of her application for charity care and consequent discharge of the debt proves that she never owed the debt. Dkt. No. 59 at 14. She points out that St. Joseph's charity care policy states that Medicaid eligibility "presumptively" qualifies a patient for charity care if Medicaid fails to pay the charges. *Id.*; *see* Dkt. No. 59-4 at 9 (provider's charity care policy). However, the policy explains that St. Joseph "*may* grant Presumptive Financial Assistance" for patients who are unable to provide required documentation, based on "information obtained from other resources" such as Medicaid eligibility. Dkt. No. 59-4 at 9 (emphasis added). Nothing in the policy suggests that Medicaid eligibility *automatically* qualifies a patient for charity care without any action by the patient or the need for a determination by the provider; rather, presumptive eligibility is simply an alternative means of establishing eligibility when patients are unable to provide documentation. *See, e.g.*, *id.* at 7 ("The granting of Financial Assistance shall be based on an individualized determination of financial need[.]"). And a patient still must "cooperate with the Hospital Facility in providing the information and documentation necessary to determine eligibility," including "exhaust[ing] all other payment options [such as] private coverage . . . prior to being approved." *Id.*; *see also id.* at 8–9 (describing application process). Riser did not apply for charity care until December 2020, and was promptly approved in early January 2021 after she provided the necessary information. Dkt. No. 61-2 at 3; Dkt. No. 59-5 at 3; Dkt. No. 62-7 at 1. This establishes only that she submitted sufficient information in 2021 for St. Joseph to discharge her debt, not that she never owed the debt in the first place.[8]

---

[8] Riser's assertion that CPC "admitted at deposition that [Riser] *does* not owe the [debt]," in conjunction with her argument that she "*did* not owe" the debt, Dkt. No. 65 at 3 (emphasis added), is misleading at best. The transcript

1    Finally, Riser argues that the debt should have been discharged under an April 29, 2019

2    consent decree between the State of Washington and several hospitals, including St. Joseph. She

3    asserts that her "account fell squarely within that consent decree and should have been discharged

4    pursuant to the consent decree, if not paid by Medicaid." Dkt. No. 59 at 4. However, the consent

5    decree required discharge of outstanding account balances only for "those patients who . . . lacked

6    any source of third-party sponsorship, including but not limited to commercial or governmental

7    insurance[.]" Dkt. No. 38-3 at 10. As Riser has insisted throughout this litigation, she was covered

8    by Medicaid at the time she received the medical services at issue, and it seems that the question

9    regarding whether she was also covered by private insurance was not resolved until 2021. Thus,

10   Riser has not established that the consent decree required St. Joseph to discharge her debt.

11   Riser has failed to adequately support her argument that she did not owe the debt when

12   CPC engaged in collection efforts and credit reporting. The Court therefore grants summary

13   judgment to CPC on Riser's FDCPA claims. Fed. R. Civ. P. 56(c)(1)(B); *Matsushita*, 475 U.S. at

14   587; *see also Chinnick*, 2017 WL 448377, at *5.

---

makes clear that CPC believed she *did* owe the debt until she completed her charity care application in 2021:

> MR. MITCHELL: . . . . [D]oes [CPC] think that [Riser] owes that balance?
> MR . BOYLE: Are you talking about now or at some point in the past?
> BY MR . MITCHELL: Now.
> A. Well, we know now that she does not.
> Q. So that information wasn't correct either, was it?
> A. The information was correct at the time.
> Q. I apologize but I don't understand. If it was determined that she doesn't owe the debt, how is that information correct?
> . . . .
> A. The information was accurate at the time. Through documentation we've learned that [Riser] never had filled out her paperwork. And once the paperwork was completed, the facility had granted her financial assistance and the account was recalled. So at the time that the letter was sent, it was accurate.

Dkt. No. 65-2 at 7–8.

**C.     Because Riser Has Not Established a Genuine Dispute Over Whether She Owed the Bill, Her State Law Claims Fail**

Riser's state law claims for outrage and violations of the CPA and CAA are premised on her unsupported assertion that she did not owe the debt. *See* Dkt. 1-2 at 17–19, 21–24; Dkt. No. 66 at 19–22. Accordingly, CPC is entitled to summary judgment on these claims as well. *See Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1035 (9th Cir. 2010) (concluding that a plaintiff could not prevail on her state law claims where such claims were predicated upon unsuccessful FDCPA claims).

## IV.     CONCLUSION

The Court GRANTS Central Portfolio Control's motion for summary judgment, Dkt. No. 60, and DENIES Riser's motion for summary judgment, Dkt. No. 59.

Dated this 27th day of June, 2023.

Lauren King
United States District Judge